[Cite as *State v. Gillman*, 2021-Ohio-4377.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Craig R. Baldwin, P.J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J.<br>Hon. William B. Hoffman, J. |
| -vs- | Case No. 20-CA-00018 |
| JACK J. GILLMAN | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS: Appeal from the Perry County Court of
Common Pleas, Case No. 19-CR-66

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: December 9, 2021

APPEARANCES:

For Plaintiff-Appellee

NANCY RIDENOUR
Assistant Prosecuting Attorney
111 North High Street
P.O. Box 569
New Lexington, Ohio 43764-0569

For Defendant-Appellant

JAMES S. SWEENEY
285 S. Liberty Street
Powell, Ohio 43065

*Hoffman, J.*

{¶1} Defendant-appellant Jack Gillman appeals his conviction and sentence entered by the Perry County Court of Common Pleas, on one count of burglary, following a jury trial. Plaintiff-appellee is the state of Ohio.

## STATEMENT OF THE CASE AND FACTS

{¶2} On September 20, 2019, the Perry County Grand Jury indicted Appellant on one count of burglary, in violation of R.C. 2911.12(A)(2), a felony of the second degree; and one count of theft, in violation of R.C. 2913.02(A)(1), a felony of the fifth degree. Appellant appeared before the trial court for arraignment on October 1, 2019, and entered a plea of not guilty to the Indictment. Appellant was released on his own recognizance.

{¶3} The matter proceeded to trial on August 24, 2020. The following evidence was adduced at trial.

{¶4} Gregory Sharrick testified he left his home at 12090 Tunnel Hill Road, Crooksville, Perry County, Ohio, at approximately 6:40 a.m. on March 23, 2019, to go to work at Cooper Standard Automotive in New Lexington. Sharrick arrived home at approximately 4:30 p.m. When he pulled into his driveway, he found the top door, which he had locked when he left, was opened and the light was on. He immediately knew someone had broken into his home. He entered the residence through the basement door and discovered the house had been ransacked.

{¶5} As Sharrick walked through the house, he noticed his Ball watch and arrowhead collection were missing from his bedroom. A chainsaw, tools, a tool chest, and a bottle of prescription medication, which had recently been filled, were also missing. Sharrick contacted the Perry County Sherriff's Office. Deputy Eveland arrived at the

residence to investigate. Deputy Eveland took photographs during the course of his investigation. Sharrick identified the photographs.

{¶6} Sharrick stated his house is equipped with Night Owl video surveillance cameras, which time-stamped the recordings. The camera installed above the top door of the residence captured the break-in, which occurred shortly after 7:00 a.m. The video surveillance footage of the break-in was played for the jury. The video, which was recorded in night vision mode, shows two men come onto the top deck, attempt to pry open the lock, but ultimately smash in the door and enter the residence. The men's faces cannot be seen. The camera above the top door, likewise, captured the men leaving the residence at approximately 7:29 a.m. This footage also was played for the jury. The video, which was recorded in daylight mode, shows the same two men exiting the residence. One of the men is carrying a chainsaw as well as a pillowcase filled with items taken from the home. The video captured both men's faces.

{¶7} Matthew Mehl, Appellant's co-defendant, testified Appellant came to his house on March 22, 2019, and talked about robbing a house he (Appellant) had driven by multiple times while taking his girlfriend back and forth to work. The following morning, Mehl and Appellant drove from Appellant's residence to a cemetery near Crooksville School. Before leaving, Mehl took a Xanax which caused him to fall asleep during the ride. Mehl woke up as Appellant was driving into the cemetery. The men walked from the cemetery through the woods to Sharrick's residence.

{¶8} Mehl and Appellant entered the house. Mehl noticed a leather couch and a wall-mounted television. He sat down on the couch and fell asleep. The next thing Mehl recalled was Appellant "hollering" for him from the basement. Appellant came upstairs

with "a Poulan chainsaw, and a Task Force tool set, and a pillowcase full of stuff." Tr. at 104. Appellant handed the items to Mehl, telling Mehl he had "some more stuff" he wanted "to get." *Id.* Appellant walked out the door and Mehl followed. The men returned to Appellant's vehicle and left the area, Appellant telling Mehl he had changed his mind about getting "more stuff."

**{¶9}** Mehl hid the chainsaw and the tool set along the road. Appellant then drove him to his "baby's mom's house." Mehl woke up the next morning and "realized it was on Facebook and everything, and I was getting ready to bring the stuff back up." *Id.* at 104. When asked what was on Facebook, Mehl explained, "Pictures of me and [Appellant] breaking in to the house." *Id.* Mehl planned to "go get the stuff that I had hid along the road and come up to the sheriff's office and turn it in because I knew what I did was wrong." *Id.* at 105. Before he was able to return the items to the authorities, Deputy Eveland arrived at his residence. Mehl gave Deputy Eveland a voluntary statement and signed a Miranda waiver. Mehl indicated he was not "given any promises of a better deal" when he made his statement. *Id.*

**{¶10}** Mehl identified a photograph of Sharrick's residence as the house he and Appellant broke into. In another photograph, Mehl identified himself as the individual carrying a chainsaw, a tool set, and a pillowcase out of Sharrick's residence. Mehl identified a photograph of Appellant as the individual with whom he broke into Sharrick's residence and stole the items. Mehl delivered the chainsaw and tool set to the police. According to Mehl, Appellant was in possession of the pillowcase and the contents.

**{¶11}** On cross-examination, Mehl stated Appellant picked him up from his baby's mom's house between 10:00 and 11:00 p.m. on March 22, 2019. Mehl indicated he and

Appellant broke into the house between 8:00 and 9:00 a.m. on March 23, 2019, but added he was "[n]ot exactly" sure of the time. *Id.* at 115. On re-direct, when asked what he and Appellant did from the time Appellant picked him up on the evening of March 22, 2019, until they broke into Sharrick's residence on the morning of the 23rd, Mehl responded, "I don't remember. Mostly rode around that night." *Id.* at 123. On re-cross examination, when asked where he stayed after Appellant picked him up, Mehl explained, "I stayed up – well, I slept in his vehicle is where I stayed. We drove around." *Id.* at 124.

**{¶12}** Deputy Brandon Eveland, who was a patrol sergeant with the Perry County Sherriff's Department in March, 2019, testified on March 23, 2019, he was dispatched to the home of Gregory Sharrick in response to a theft.[1] Sharrick provided Deputy Eveland with a list of the stolen items. The deputy collected evidence including video taken from Sharrick's surveillance cameras. When he returned to the Perry County Sherriff's Department, Deputy Eveland posted the video and still photographs on the Sherriff's Department's public Facebook page.

**{¶13}** Later that evening, as a result of the Facebook post, Matthew Mehl was identified as a suspect. Deputy Dixon, who was familiar with Mehl, provided Deputy Eveland with Mehl's address. Deputies Eveland and Ross proceeded to Mehl's residence. Mehl agreed to speak to the deputies. Mehl "immediately began giving a voluntary statement, and then he was advised of his Miranda rights." *Id.* at 131. Deputy Eveland informed Mehl he was under no obligation to speak with him. Mehl signed a Miranda waiver form.

---

[1] Brandon Eveland was employed with the City of Lancaster Police Department at the time of the trial. Throughout the trial, he is addressed as both Deputy Eveland and Officer Eveland. For consistency, we chose to address Brandon Eveland as Deputy Eveland in this Opinion.

{¶14} Mehl told Deputies Eveland and Ross Appellant told him he (Appellant) needed money. He and Appellant went to the residence, forced entry, and stole a chain saw, a tool set, and a bag of unknown items. Mehl indicated he and Appellant left the residence after approximately 30 minutes. Mehl did not tell Deputies Eveland and Ross where he went after he and Appellant left the Sharrick residence.

{¶15} Deputy Eveland testified he spoke with Mehl on three separate occasions and noted Mehl gave the same or similar statements each time. Deputy Eveland added Mehl's trial testimony was similar to the statements he (Mehl) made to him (Deputy Eveland). Deputy Eveland stated he did not give Mehl any indication he would receive a lesser sentence if he were to implicate a co-defendant. The deputy had no doubt in his mind Mehl was being truthful. Deputy Eveland identified photographs he had taken at the scene as well as photographs of the chain saw and tool set he recovered from Mehl. The only individual Mehl implicated was Appellant. When asked if he had the opportunity to interview Appellant, Deputy Eveland answered, "No, he declined an interview." *Id.* at 139.

{¶16} The body camera footage of Deputy Eveland's interview with Mehl during the late evening hours of March 23, 2019, and the video of Deputy Eveland's interview with Mehl at the Sherriff's Department on March 24, 2019, were played for the jury. For some reason which the deputy could not explain, only the audio portions of the recordings played. Mehl's rendition of the events of the morning of March 23, 2019, are substantially similar in both interviews. Mehl told the deputy Appellant approached him asking for help because he [Appellant] needed formula for his newborn daughters. Appellant's wife had been laid off and Appellant himself had been unable to make any money.

**{¶17}** Kenneth Vanoster, Appellant's friend, Rebecca Gillman, Appellant's wife, and Kristy Chevalier, Appellant's sister, testified on Appellant's behalf. Vanoster stated he saw Appellant at Chevalier's house between 7:25 and 8:00 a.m. on March 23, 2019. Vanoster stopped by to tell Appellant he would not be at the birthday party for Appellant's son.

**{¶18}** Gillman testified she, Appellant, and their children arrived at Chevalier's house between 6:30 and 6:45 a.m. on March 23, 2019. Gillman explained March 23, was their son's 8th birthday, and the family planned to go to the skating rink followed by KFC and cake. Gillman stated they left Chevalier's house at approximately 9:30 a.m., and went McDonald's for breakfast. Gillman recalled Vanoster stopped by around 7:45 a.m., to tell them he would not be at the birthday party. After breakfast, Gillman, Appellant, and their children drove to Somerset, Ohio, to pick up Appellant's niece. Chevalier and her family went to fill up her vehicle with gas. Gillman indicated she and Appellant have never had any problems paying their bills, she was employed at the time of the break-in, and the family received assistance with formula and milk through WIC (Women, Infants, & Children program).

**{¶19}** Chevalier testified Appellant and his family arrived at her house at 6:45 a.m. on March 23, 2019. Chevalier stated Vanoster arrived around 7:45 a.m., to tell Appellant he would not be able to attend the party. After Vanoster left, the group went to McDonald's for breakfast. Chevalier, her fiancé, and her son stopped at a gas station then proceeded to a roller rink in Zanesville. After skating for two or three hours, the group went to Kentucky Fried Chicken to eat. They picked up an ice cream cake at Dairy Queen in New Lexington, and returned to Chevalier's house.

{¶20} Appellant testified on his own behalf. When asked why the date March 23, 2019, was important to him, he responded it was the birthday of one of his children. His son, L.J., was turning 8, and they planned to go to the skating rink and then have KFC and ice cream cake. Appellant recalled his wife woke him up between 6:15 and 6:30 a.m. About 10 minutes later, Appellant, his wife, and six children left their residence and went to Appellant's sister's house. Appellant and his children had spent the evening of March 22, 2019, at his sister's house. Appellant and his sister made plans to go out to breakfast the next morning. Appellant and his children left his sister's house between 11:30 p.m. and midnight, and picked up his wife from work around 12:30 – 1:00 a.m. Appellant and his family arrived home at 1:30 a.m.

{¶21} Appellant stated he has known Matthew Mehl since Mehl was five or six years old, and "I never have liked him." *Id.* at 187. Appellant described Mehl as shady. Appellant testified he hired Mehl to work on his vehicle. According to Appellant, he gave Mehl "75 bucks, he took my tool set, took my money, and he didn't come back," adding, "He stole everything from me. He took our TVs." *Id.* Appellant denied ever breaking into someone else's home with Mehl. Appellant indicated, during his cross-examination, he filed a police report, but no charges were filed against Mehl.

{¶22} Appellant was questioned on cross-examination about why and how his family was able to wake up at such an early hour on the morning of March 23, 2019, after being out so late the evening before. Appellant responded, "Yo, you never had plans? You never wanted to do anything with your family?" *Id.* at 191. On re-direct, Appellant stated the police never contacted him regarding the instant matter. Appellant added he would have talked to the police if he had been contacted.

**{¶23}** After hearing the evidence and deliberating, the jury found Appellant guilty of burglary, but not guilty of theft. The trial court ordered a presentence investigation. On August 28, 2020, the trial court sentenced Appellant to an indefinite term of imprisonment of 3 to 4 ½ years. The trial court ordered Appellant to pay restitution in the amount of $2,590.00, to Greg Sherrick. The trial court memorialized Appellant's conviction and sentence via Return on Verdict and Termination Judgment Entry filed August 31, 2020. Appellant filed a motion for new trial on September 1, 2020. Following a hearing, the trial court denied Appellant's motion via Judgment Entry filed November 9, 2020.

**{¶24}** It is from his conviction and sentence Appellant appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE JUDGMENT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE

II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO DECLARE A MISTRIAL OR ISSUE A CURATIVE INSTRUCTION SUA SPONTE AFTER THE PROSECUTOR ELICITED TESTIMONY REGARDING APPELLANT'S PRE-ARREST SILENCE

III. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL TO A DEGREE THAT APPELLANT DID NOT RECEIVE A FAIR TRIAL

I

{¶25} In his first assignment of error, Appellant challenges his conviction as against the manifest weight of the evidence.

{¶26} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

{¶27} Appellant was convicted of burglary in violation of R.C. 2911.12(A)(1):

(A) No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.]

{¶28} Appellant sets forth "various reasons" to support his position the evidence presented to the jury did not support his conviction. First, Appellant contends the testimony of Matthew Mehl was untrustworthy, describing Mehl's memory of the incident

as "quite poor." Brief of Appellant at 6. Appellant notes Mehl was unable to recall the time of the break-in or how long they were in Sharrick's home. Further, Mehl admitted "he was under the influence at the time of what he believes was Xanax," and testified "I don't know what I did." *Id.* (Citation to Trial Transcript omitted). Appellant adds Mehl's testimony was "far-fetched," referencing Mehl's testimony he and Appellant drove around all night, and he fell asleep during the burglary. Next, Appellant submits his testimony and the testimony of his witnesses placed him at his sister's house at the time of the break-in. Finally, Appellant argues the video surveillance evidence was "not as convincing as one might think," explaining Sharrick initially believed the person seen in the surveillance video with Mehl was a man named Jeremy Sprankle.

{¶29} Upon review of the entire record, including reading the entire transcript and listening to Deputy Eveland's interviews with Matthew Mehl, we find Appellant's conviction was not against the manifest weight of the evidence. Mehl's trial testimony and the statements he made during interviews with Deputy Eveland were substantially similar as detailed supra. Mehl testified Appellant approached him about robbing a house he (Appellant) had driven by multiple times while taking his girlfriend back and forth to work. Mehl agreed and the men executed Appellant's plan to break into Sharrick's residence on the morning of March 23, 3019. Mehl identified Appellant from a photograph taken from Sharrick's video surveillance equipment. Deputy Eveland testified each time he interviewed Mehl, his statements were Mehl's statements were the same or similar to his previous statements. Deputy Eveland further stated Mehl's trial testimony was similar to his out-of-court statements regarding the events.

{¶30} The jury was free to accept or reject any or all of the evidence offered by the parties and assess the witnesses' credibility. Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. McGregor*, 5th Dist. Ashland No. 15-COA-023, 2016-Ohio-3082, 2016 WL 294299. The jury clearly believed the testimony of the state's witnesses over the testimony of Appellant and his witnesses, and concluded Appellant was present at Sharrick's home at the time of the break-in and participated in the offense.

{¶31} Appellant's first assignment of error is overruled.

II

{¶32} In his second assignment of error, Appellant contends the trial court committed plain error in failing to declare a mistrial or issue a curative instruction sua sponte after the prosecutor elicited testimony regarding Appellant's pre-arrest silence.

{¶33} "Mistrials need to be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The standard of review for evaluating a trial court's decision to grant or deny a mistrial is abuse of discretion. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). In reviewing a claim a mistrial should have been granted, the Ohio Supreme Court has noted "[t]his court has instead adopted an approach which grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *State v. Shaffer*, 5th Dist. Richland No. 2003-CA-0108, 2004-Ohio-3717, 2004 WL 1563644, ¶ 18, quoting *State v. Widner* (1981), 68 Ohio St.2d 188, 429 N.E.2d 1065. See, also, *Wade v. Hunter* (1949), 336 U.S. 684, 687, 69 S.Ct. 834, 836, 93 L.Ed.

974. An abuse of discretion connotes more than an error of law or judgment. It implies the trial court ruled arbitrarily, unreasonably, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶34}** The Fifth Amendment to the United States Constitution provides no person "shall be compelled in any criminal case to be a witness against himself. The Ohio Supreme Court has interpreted this clause as precluding the state from offering evidence of pre-arrest silence as substantive evidence of the criminal defendant's guilt. See, *State v. Leach,* 102 Ohio St.3d 135, 2004–Ohio–2147, ¶ 30 ("[T]he use of [a defendant's] pre-arrest silence in the state's case-in-chief as *substantive* evidence of guilt subverts the policies behind the Fifth Amendment."). In *Leach,* the state referred to the defendant's pre-arrest silence in its opening statement and purposefully elicited testimony to that effect from the investigating officers. Meanwhile, the other evidence of the defendant's guilt was "not overwhelming." *Id.* at ¶ 38. Consequently, the Supreme Court found the state offered the defendant's pre-arrest silence as substantive evidence of guilt and reversed his conviction. *Id.*

**{¶35}** We find *Leach*, supra, to be factually distinguishable; therefore, inapplicable to the instant action. Here, Deputy Eveland was asked if he "had the opportunity to interview [Appellant] regarding this." Tr. at 139. Deputy Eveland responded, "No, he declined an interview." *Id.* While Deputy Eveland's response to the prosecutor's question was a reference to Appellant's pre-arrest silence, we find said response was harmless because Appellant, in contrast to the defendant in *Leach*, testified in his own defense, thereby, waiving his Fifth Amendment right to remain silent. Accord, *State v. Poteet*, 7th Dist. Columbiana No. 19-CO-0030, 2020-Ohio-4732; *State v. Wall*, 6th Dist. Erie No. E-

19-040, 2020-Ohio-5446. Additionally, unlike *Leach*, in which the prosecution presented testimony regarding the defendant's silence as substantive evidence of guilt, we find the state herein did not affirmatively seek to use Appellant's decision not to be interviewed as such and note Appellant testified he would have talked to the police if he had been contacted.

**{¶36}** Based upon the foregoing, we find the trial court did not abuse its discretion in not declaring a mistrial.

**{¶37}** Within this assignment of error, Appellant also argues, although he did not object to Detective Eveland's testimony, the trial court should have sua sponte given a curative instruction. By failing to object, Appellant has forfeited all but plain error. For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *Shine-Johnson* at 102,, quoting *State v. Urbina*, 10th Dist. No. 15AP-978, 72 N.E.3d 105, 2016-Ohio-7009, ¶ 43, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶38}** Having found, supra, Appellant's Fifth Amendment right against self-incrimination was not violated, we find no error, plain or otherwise, in the trial court's failure to sua sponte give a curative instruction.

**{¶39}** Appellant's second assignment of error is overruled.

III

**{¶40}** In his third assignment of error, Appellant maintains trial counsel was ineffective for failing to either request a mistrial or a curative instruction following the

testimony regarding Appellant's pre-arrest silence, and for failing to question Matthew Mehl regarding his agreement with the state to testify against Appellant.

{¶41} A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of ineffective assistance of counsel, Appellant must show counsel's performance fell below an objective standard of reasonable representation and, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, Appellant must show counsel's conduct so undermined the proper functioning of the adversarial process the proceedings cannot be relied upon as having produced a just result. *Id.* In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley* at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

{¶42} In order to warrant a reversal, Appellant must additionally show he was prejudiced by counsel's ineffectiveness. "Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel." *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965, citing *Lockhart v. Fretwell* (1993), 506 U.S. 364, 370, 113 S.Ct. 838, 122 L.Ed.2d 180. The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, quoting *Strickland* at 697.

{¶43} Having concluded in Assignment of Error II, supra, Detective Eveland's testimony Appellant declined an interview with him did not violate Appellant's Fifth Amendment right against self-incrimination, we find Appellant was not prejudiced by trial counsel's failure to move for a mistrial or request a curative instruction.

{¶44} We now turn to Appellant's assertion trial counsel was ineffective for failing to question Mehl relative to his agreement with the state to testify against Appellant. We note Mehl had already testified on direct examination he had not been "given any promises of a better deal" before giving Deputy Eveland his voluntary statement. Tr. at 105. Assuming, arguendo, trial counsel was ineffective for failing to conduct this line of questioning, we find Appellant cannot and did not establish, "but for counsel's error, the result of the proceedings would have been different." *Strickland*, supra.

{¶45} Appellant's third assignment of error is overruled.

{¶46} The judgment of the Perry County Court of Common Pleas is affirmed.

By: Hoffman, J.
Baldwin, P.J. and
Gwin, J. concur