[Cite as *State v. Collins*, 2024-Ohio-794.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                          :
                                        :       Case No. 22CA16
        Plaintiff-Appellee,             :
                                        :
        v.                              :       <u>DECISION AND JUDGMENT
                                        :       ENTRY</u>
LOGAN C.M. COLLINS,                     :
                                        :       **RELEASED: 02/27/2024**
        Defendant-Appellant.            :

<u>APPEARANCES:</u>

Stephen E. Palmer, Yavitch & Palmer Co., L.P.A., Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Ross County Prosecuting Attorney, Chillicothe, Ohio, for appellee.

Wilkin, J.

{¶1} This is an appeal from a Ross County Court of Common Pleas judgment of conviction in which the jury found appellant, Logan C.M. Collins, guilty of unlawful sexual conduct with a minor, a third-degree felony. The trial court imposed a prison term of five years. Collins challenges his conviction in three assignments of error.

{¶2} First, Collins maintains that his conviction is against the manifest weight of the evidence because the jury lost its way in determining the credibility of the witnesses. According to Collins, there were several inconsistencies in the testimony of the victim's great uncle. Alternatively, his testimony along with the testimony of his sister, wife and mother, were consistent and demonstrated Collins was not at his house on the alleged date and time when the sexual

assault occurred.  Moreover, Collins asserts the text messages that were admitted as the state's exhibits between him and the victim, B.P., do not corroborate the state's witnesses' assertions.  Collins claims many of the text messages were fabricated by B.P. who was a troubled child with an infatuation with Collins.

{¶3} We disagree.  We defer to the jury since the jury was "in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility."  *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 28, citing *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.  Further, a conviction is not against the manifest weight of the evidence simply because the jury believed the state's witnesses.  What is more, there is substantial credible evidence that Collins committed the offense as charged.  B.P. resides with her great uncle Landon "Jake" ("Jake") and his wife Kelly.  Jake and Kelly live across the street from Collins' house.  On February 1st, Collins sent a text message to Jake requesting B.P. return the drill Jake had borrowed from Collins.  When B.P. went to Collins' house, Collins was home alone and invited B.P. in.  At his house, Collins prompted B.P., who was 14 years of age at the time, to perform fellatio on him.

{¶4} Second, Collins argues it was plain error for the state to intentionally elicit testimony from Captain Stanley J. Addy that Collins did not want to make a statement while the investigation was ongoing.  Collins maintains the violation of his Fifth Amendment right to remain silent was highly prejudicial and warrants reversal of his conviction.  We disagree.  The two-line questioning was not

introduced as substantive evidence of guilt by the prosecution.  There was no reference to Collins' election to remain silent during the state's opening statement, its cross-examination of Collins, or in closing arguments.  Collins' conviction is supported by overwhelming evidence, thus, the admission of Captain Addy's testimony did not affect the outcome of the case.

{¶5} Finally, Collins claims his trial counsel was ineffective for failing to object to the state's questioning of Captain Addy in which the Captain responded that Collins did not want to make a statement.  We overrule this argument as Collins cannot demonstrate prejudice.  We, therefore, overrule all three assignments of error and affirm Collins' conviction.

FACTS AND PROCEDURAL BACKGROUND

{¶6} Collins' criminal proceedings began in April 2021, with the filing of the indictment accusing him of committing the offense of unlawful sexual conduct with a minor, a third-degree felony, in violation of R.C. 2907.04.  The indictment specified that the offense occurred on February 1, 2021, and additionally that the victim, B.P., was between 13 and 16 years old.  The indictment also stated that Collins was older than B.P. by more than ten years.  Collins pleaded not guilty to the offense and the matter proceeded to a two-day jury trial.

{¶7} The state's six witnesses and defendant's four witnesses all testified during the first day of trial.  During the state's case-in-chief, Jake was the first witness.  Jake is B.P.'s great uncle and in March 2019, after the death of B.P.'s mother due to overdose, B.P. and her two younger siblings, E.P. and N.B., came to live with him and his wife, Kelly.  B.P.'s father had passed away years prior

also to an overdose.

{¶8} Jake and Kelly live across the street from Collins and they have been neighbors for approximately four years.  Jake was living at his residence before Collins moved into the neighborhood.  At the time of the offense, Collins and his wife, Kentessa Collins, resided at their home with their two-year-old daughter, C.C., and their one-month-old son, T.C.  Collins and Jake's family had a good neighborly relation in which Kentessa was babysitting N.B. for a year, they borrowed tools from each other, and just generally helped each other.

{¶9} So when Jake received a text message from Collins on February 1st for the return of his drill, Jake did not hesitate to call on B.P. to walk the drill over to Collins's house.  Collins specifically asked for B.P. to bring the drill.  The text message, which Collins admitted to sending, was dated February 1st at 6:40 p.m. and stated: "Hey can [B.P.] bring my impact drill and charger over?"  At 6:48 p.m., Jake responded: "I will send her over I just charged the battery[.]"  Right away, Collins responded: "Ok thanks[.]"

{¶10} Within five minutes of Collins' response, B.P. went to the garage and retrieved the drill and walked it over to his house.  According to both Jake and his wife, who was the state's second witness, B.P. was gone for over 25 minutes.  When B.P. returned, she went straight to her bedroom.  Jake and Kelly both testified that they were not concerned when B.P. returned and went straight to her room, although that was unusual.

{¶11} What occurred at Collins' house was not revealed until the next day, February 2, 2021.  The state's third witness, Breanna Reed, was involved with

Jake and Kelly's son and had bonded with B.P.  Breanna was 21 years old and was like a big sister to B.P.  The morning of February 2nd, B.P. reached out to Breanna and via text messaging informed Breanna of what occurred at Collins' house the evening before.  Consequently, Breanna reached out to Kelly to discuss the situation.  After hanging up with Breanna, Kelly and Jake spoke directly with B.P.

{¶12} During the conversation, Jake described B.P. as "nervous. Scared. She didn't want to open up, I think to me more than Kelly.  She was embarrassed I think."  Kelly similarly described B.P. as "[v]ery nervous. Very fidgety. No eye contact. Just, I can't even describe. She was very fidgety."  Kelly explained that B.P.'s behavior was not normal and Kelly thought B.P. was lying when she initially denied anything happened at Collins' house.  With Kelly's insistence, B.P. revealed what happened at Collins' house and in response, Kelly contacted the Ross County Sheriff's Office.

{¶13} B.P. was the state's fourth witness.  B.P. elaborated on how Collins was messaging her inappropriate things since October 2020.  Collins began his communication via text messaging but then it was through Snapchat, Instagram, Tiktok, and Facebook.  In these inappropriate messages, Collins would ask her to give him oral sex.  When she took the drill to Collins' house on February 1st, she was standing outside and did not want to go in because earlier in the day he asked for oral sex again.  Collins, however, insisted she come inside and told her that if she did not go inside, Jake would think something was wrong.  So, she went inside.  Once inside, she stood by a wall for a few minutes before Collins

asked her if she was going to do something for him and hugged her.

{¶14} At this moment, Collins' wife called him, and he took the facetime phone call in his daughter's bedroom. B.P. did not leave and just stood there in the living room. B.P. elaborated that she just stood there because she was scared and did not know what to do. When Collins returned, his pants and underwear were down to his ankles. Collins approached B.P. and began touching her breast area. B.P. took a few steps back and Collins sighed and sat on the couch with his pants and underwear still down. B.P. was just standing there and had her hands on her face when she started feeling her hand being pulled toward Collins, who then placed his hand down her pants. B.P. then sat down on the floor in front of Collins. B.P. testified that

> [a] couple of minutes went by, I repositioned myself a little bit. He put my hand on his penis. I didn't, of course I'm not going to find a twenty-six-year-old man sexually attractive. I made him put a blanket on his head because I didn't want to see him; and he put my head down on his penis.

{¶15} "[W]ithin the first minute [B.P.] said can I stop, can I be done? And he said no and pushed my head back down." B.P. continued and Collins ejaculated. Collins wiped B.P.'s face with a tissue and pulled his pants up. He then handed B.P. her phone and asked if she deleted the messages. She said yes, and he opened his door and she walked back home. When she arrived home, she went straight to her bedroom.

{¶16} The state's final two witnesses were Deputy Dylan Speakman and Captain Stanley J. Addy of the Ross County Sheriff's Office. Deputy Speakman was one of the deputies that was dispatched to Jake and Kelly's house on

February 2nd regarding a sexual assault case.  After speaking with Jake, Kelly and B.P., the deputy filed a complaint identifying the perpetrator as the neighbor across the street.  Deputy Speakman completed his report and passed it to his lieutenant.

{¶17} Captain Addy received a call from Kelly on February 15, 2021, asking about the status of the case.  It was at this point that he went and retrieved the file and began the investigation.  As part of his investigation, he conducted a phone dump of B.P.'s phone.  This is when the phone was transferred to a forensic lab and was connected to a computer to retrieve all information in it.  The dump revealed 636 messages were deleted, but they had already been overwritten so the content of the messages could not be retrieved.

{¶18} After the state rested, Collins testified on his own behalf denying he was ever alone with B.P., seeing her on February 1st, or having any inappropriate contact with her.  The next witness was Terry Collins, who is Collins' mother.  Similar to his testimony, she testified that the weekend of January 30, 2021, she along with Collins and his family, and her daughter Tyra and her family, spent two nights in a hotel in Columbus.  They did not checkout until noon on February 1st.  After that, they all drove to Cabela's, then to McDonald's and had lunch in the parking lot as the dining area was closed.  After that, they went to Kroger in Chillicothe.  At this point they separated as a group, but that around 6:30 p.m., Collins, his wife and two children, came to Terry's house to celebrate Collins' daughter's second birthday.

{¶19} Tyra Collins-Newland testified next.[1] Tyra is Collins' sister and she and her husband and children reside with Terry. She reiterated that they spent two nights in a hotel in Columbus and did not check out until noon on February 1st. Additionally, she testified that on that day, at 6:30 p.m., Collins and his wife and two kids arrived at Terry's house to celebrate his daughter's birthday.

{¶20} Collins' wife was his last witness. Kentessa testified that she is familiar with B.P. and babysat her younger brother, N.B., for over a year until she broke her ankle in October 2020 after being in a car accident. When she was babysitting, B.P. would come in the morning around 7:30 a.m. and drop N.B. off, and then pick him up around 3 p.m. Kentessa testified that B.P. was odd and that they limited interaction with B.P. and believe B.P. is making this up, as Collins does not have Tiktok or Snapchat or Instagram. And on February 1st, she was with Collins the whole day and at 6:30 p.m. they went to Terry's house and did not leave until after midnight.

{¶21} Based on this evidence, the jury deliberated for over three hours before finding Collins guilty of unlawful sexual conduct with a minor with the additional finding that Collins was more than ten years older than B.P. As a third-degree felony, the trial court imposed a prison term of five years and advised Collins of the mandatory five-year postrelease control. It is from this judgment of conviction entry that Collins appeals.

ASSIGNMENTS OF ERROR

I.       THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF
         THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT TO
         DUE PROCESS AS GUARANTEED BY THE OHIO

---

[1] In the transcript she is identified as Tyler, but that is in error. Her name is Tyra.

CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

II.      THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING TESTIMONY OF APPELLANT'S SILENCE, IN VIOLAITION OF APPELLANT'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

III.     TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO IMPERMISSIBLE QUESTIONING AND TESTIMONY BY THE STATE, IN VIOLATION OF DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR I

{¶22} In the first assignment of error, Collins argues his conviction is against the manifest weight of the evidence. The conviction came down to the credibility of the witnesses, and Collins claims the jury lost its way when it gave more credibility to the state's witnesses than his and his family members' testimonies. Collins focuses his argument on the inconsistency in Jake's testimony and the lack of physical evidence to corroborate the state's witnesses. First, Collins attacks Jake's testimony that Collins was home when B.P. went over with the drill because Jake's distance estimation of how far the houses are was put into question. Thus, Jake's ability to have actually seen Collins that dark evening was not credible. Second, Collins claims that the state did not submit any corroborating evidence to support the conviction. Such as Collins' phone log to support B.P.'s claim that he facetimed his wife while B.P. was at his house, or footprints or tire tracks from his house that would have been visible since it was

snowing that evening.

{¶23} Third, the text messages in the state's exhibits did not corroborate Jake and B.P.'s testimony, where Collins admitted to sending messages in three of the state's exhibits, but explained the content of the messages establishing they were not incriminating evidence. As explained by Collins, the message asking for the drill was sent much earlier in the day and he just expected B.P. to drop the drill off at his covered front porch as was customary if no one was home. Further, the messages in State's Exhibit Two were sent to check on Jake and the family. And the duplicated messages sent to B.P. in State's Exhibit Six were made to see if B.P. needed a ride to school or to check in on the babysitting situation for her younger brother N.B. The remaining messages in the state's four other exhibits were fabricated by B.P. who is technologically savvy.

{¶24} Fourth, Collins questions the investigation, where there was a delay of approximately two weeks. Finally, Collins maintains that the only consistent testimony was his and that of his family members. Collins spent the day with his family and did not return to his house to get together with B.P. According to Collins, "[i]t defies reason to suggest that his entire family would lie about that in a concerted effort to cover up a sexual assault." Therefore, under the totality-of-the-circumstances, the jury lost its way when it found Collins guilty of the offense.

{¶25} In response, the state maintains that Collins' conviction is not against the manifest weight of the evidence because the jury believed the state's witnesses. The state submitted corroborating evidence including a text message from Collins to Jake the evening of the offense asking for B.P. to come over and

drop off the drill.  Further, the state's evidence included hundreds of deleted messages from B.P.'s phone that B.P. deleted at the direction of Collins.

**{¶26}** The state disagrees with Collins' assessment of the discrepancy between Collins' and Jake's distance determination between their houses.  The state asserts this discrepancy did not negate the fact that Jake can see Collins' house from his window and was able to see Collins return home alone the evening of the sexual assault.  Finally, the state contends that Collins' testimony and his family members' testimony seemed scripted, and Collins' explanation of the text messages did not make sense.  Accordingly, the state requests that we affirm Collins' conviction in which B.P. gave a detailed description of the assault.

I.       Law

**{¶27}** In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

> Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected

to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

**{¶28}** "[A]ppellate courts recognize that issues of evidence weight and witness credibility are matters for the trier of fact to determine, as long as a rational basis exists in the record for its decision."  *State v. Greeno*, 4th Dist. Pickaway No. 19CA15, 2021-Ohio-1372, ¶ 15.  The trier of fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility."  *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 28, citing *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.

**{¶29}** In addition, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses." *State v. Chancey*, 4th Dist. Washington No. 15CA17, 2015-Ohio-5585, ¶ 36, citing *State v. Wilson,* 9th Dist. Lorain No. 12CA010263, 2014-Ohio-3182, ¶ 24, citing *State v. Martinez,* 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences (sic.) do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' "  *State v. Corson*, 4th Dist. Pickaway No. 15CA4, 2015-Ohio-5332, ¶ 31, quoting

*State v. Proby*, 10th Dist. Franklin No.15AP-1067, 2015-Ohio-3364, ¶ 42, citing

*State v. Gullick*, 10th Dist. Franklin No. 13AP-317, 2014-Ohio-1642, ¶ 10.

**{¶30}** Collins was convicted of unlawful sexual conduct with a minor in

violation of R.C. 2907.04(A) which provides:

> No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard.

With the additional finding that he was ten years older than B.P., making his

offense a third-degree felony. *See* R.C. 2907.04(B)(3) ("Except as otherwise

provided in division (B)(4) of this section, if the offender is ten or more years

older than the other person, unlawful sexual conduct with a minor is a felony of

the third degree.") Sexual conduct is defined as "vaginal intercourse between a

male and female; anal intercourse, fellatio, and cunnilingus between persons

regardless of sex[.]" R.C. 2907.01(A).

## II. Analysis

**{¶31}** Collins challenges the credibility of some of the state's witnesses

and exhibits. He maintains that there were many inconsistencies and the jury

lost its way by finding credible Jake's and B.P.'s testimonies. Accordingly, we

will begin by outlining the evidence submitted at trial.

### A. State's Exhibits

**{¶32}** The state submitted seven exhibits which were text messages from

Collins to either Jake or to B.P.

- State's Exhibit One is messages from Collins to Jake with Jake responding once:

- Monday, February 1, 2021 at 6:40 p.m. Collins reached out to Jake: "Hey can [B.P.] bring my impact drill and charger over[.]" Jake responds at 6:48 p.m.: "I will send her over I just charged the battery[.]" Within the same minute, Collins responded: "Ok thanks[.]"
- Thursday, February 4, 2021 at 11:09 a.m., Collins sent the following to Jake: "Are my dogs in the yard?"

- State's Exhibit Two is a series of messages from Collins to B.P. via Facebook with no response from B.P.:
  - No date stamp for the following messages: "Are you not talking to me now?" "Hello" "Is everything ok?" "I tried to call jake he didn't answer[.]"
  - Thursday, February 4 at 5:00 p.m.: "How's baby sitting" "Talk to me say something please" "Anything at all? Did you get in trouble or something" "Can you tell me anything? Like why are you ignoring me[?]"

- State's Exhibit Three is a series of messages from Collins to B.P. via Instagram with no response from B.P.:
  - These two messages are dated February 4, 2021, with a time frame of 11:44 a.m.: "Please tell me what's wrong" "??"
  - Then at 5 p.m. on February 4, 2021, Collins sent B.P. the following: "Can you not tell me anything? Please tell me what is going on" "Tess thinks you guys hate her" "You can't fill me in at all?" "Wanna see a video of [C.C.] arguing with herself in the mirror[?]"

- State's Exhibit Four is a series of messages from Collins to B.P. via Tiktok with no response from B.P. The messages are dated February 4, 2021 with a time frame of 8:29 p.m.: "Ok tell me what's going on" "It's Logan now tell me what's going on" "Like are you just mad at me or what" "Are we just being ignored or is something going down[?]"

- State's Exhibit Five is two messages from Collins to B.P. via Snapchat again with no response from B.P. The messages are dated February 4, 2021: "Hey" "Can you not just tell me what I need to know[?]"

- State's Exhibit Six is two messages from Collins to B.P. via imessages sent on February 4, 2021 at 10:43 a.m. with Collins sending the same message: "Why aren't you in school" "Why aren't you in school[?]"

- State's Exhibit Seven does not have a date but is a message exchange between B.P. and Collins:
  B.P.:  "idk what I did wrong"
        "Ik it was bad but I'll get better"
  Collins: "Listen it was not you you were great I'm just not comfortable with it ok"
  B.P.:  "Mk"
  Collins: "Seriously now delete every message and we will go back to only talking in person ok"
  B.P.:  "It's fine it's whatever if u were weirded out that's fine"
        "and k"

### B.  State's Key Witnesses

**{¶33}** Jake was in the neighborhood for three years before Collins and his wife moved across the street.  Collins and Jake were neighbors for almost four years before Collins assaulted B.P.  In March 2019, B.P. and her two younger siblings moved in with Jake and his wife Kelly after their mother died.  At the time B.P. and her siblings moved in, Jake was working, but in November 2019, Jake stopped working due to being diagnosed with cancer.  Due to surgeries and extensive treatments, Jake was not very mobile and spent most of his time sitting in his reclining chair in front of the window.  From the window, Jake has a view of Collins' house and a little bit of the street.

**{¶34}** On February 1, 2021, Jake saw Collins leave the house with his wife and kids, but later saw Collins return alone.  The evening of February 1st, Jake received a message from Collins asking for B.P. to return his drill back to him.  Jake summoned B.P. and she agreed to take the drill over.  Jake saw B.P. walk over to Collins' house and was gone for approximately 25 minutes.  After B.P. returned, Jake saw Collins leave his house in his van.  It was not until the next day that Jake became aware that B.P. was assaulted by Collins.  Jake and Kelly

spoke with B.P. the morning of February 2nd when B.P. while "nervous" and "scared" disclosed what occurred.  As a result, the Ross County Sheriff's Office was contacted and two deputies came to Jake's house to talk to B.P.

{¶35} During cross-examination, Jake was questioned on whether he wore glasses, and whether it was dark that evening.  Jake testified that the evening of February 1st he was not wearing glasses but that he is supposed to wear glasses when he drives.  He also responded that it was dark but that there was a light on outside; thus, he was able to see Collins' house and driveway.  Jake was also questioned about the distance between the two houses, with Jake saying it was about 50 feet, but that his house from the road was similar distance from a point in the courtroom to the wall.

{¶36} Kelly was the second witness and she was home the evening of February 1, 2021, when Jake received a text message from Collins.  In response to the message, Jake asked B.P. to retrieve the drill from the garage and take it over to Collins' house.  Kelly saw B.P. walk over to Collins' house and was gone for approximately 25 minutes.  The next day she received a message from Breanna asking Kelly to call her.  After her phone call with Breanna, Kelly and Jake spoke with B.P. who was "very nervous" in which B.P. initially denied anything happened, but then revealed the assault.  During cross-examination, Kelly was asked whether B.P. was a strong girl and whether she was technologically savvy.  The response was yes to both.

{¶37} The fourth witness was B.P.  She described in detail how her time at Collins' house on the evening of February 1st was spent.  B.P. took the drill over

to Collins' house and she did not want to go inside; however, Collins insisted and he even told her that if she did not come in then Jake would think something was wrong. While at Collins house, B.P. stood awkwardly against the wall for a few minutes and covered her face with her hands at certain moments. This is because she knew what was about to happen due to the earlier messages from Collins wanting oral sex. B.P. explained that before Collins received a facetime phone call from his wife, he was hugging her. Collins accepted the phone call from his wife and B.P. could hear the conversation. Kentessa was asking Collins to return to his mother's house as they were all waiting on him.

{¶38} After hanging up the phone, Collins returned to the living room with his underwear and pants down to his ankles. Collins moved closer to B.P. and touched her breast area, and when she covered her face he sighed and sat on the couch still with his underwear and pants down. Collins grabbed B.P. toward him and placed his hand inside her pants. B.P. was scared and sat down on the floor, but felt she had to give Collins what he wanted as he was blackmailing her. The blackmail involved keeping his young children away from her whom she loves very much, and also telling Jake and Kelly that she was a bad girl and drinks. While B.P. was on the floor by the couch, Collins grabbed her hand and placed it on his penis, and then he placed her head on his penis. B.P. then performed fellatio and Collins ejaculated.

### C. Collins' Witnesses

{¶39} Collins testified on his own behalf. He testified that he lives across the street from Jake and Kelly and that the distance is about 600 feet between

the two houses. Prior to October 2020, Kentessa was babysitting N.B., and because B.P. would drop and pick him up, she was usually at their house from 2:30 p.m. until around 3:30 p.m. when Collins would return home from work. B.P. would normally leave shortly thereafter and that Collins was never alone with B.P., especially since she was infatuated with him.

{¶40} The weekend of January 30, 2021, he was in Columbus with his family and spent two nights at the Drury Inn. They did not checkout until noon on February 1st, went to Cabela's, McDonald's, Kroger, Petland and then home. Collins, his wife and children arrived at his house between 4:30 p.m. and 4:45 p.m. that day. While at home, he helped his wife bake a cake for his daughter's birthday party. After baking the cake, they left and were at his mother's house by 6:30 p.m. Collins did not leave his mother's house at any point and was there until he and his wife left around midnight. Collins admitted to sending the message to Jake asking for his drill back on February 1st, but claims he sent it before he left to go to his mother's house. Collins did not receive a response back from Jake until after Collins had arrived at his mother's house. He did not hesitate to respond "Ok thanks" to Jake because he assumed, as has happened before, that B.P. would place the drill on the covered porch when no one was home.

{¶41} Collins admitted to sending the messages to B.P. in State's Exhibits Two and Six, but denied the other messages as coming from him since he does not have Tiktok, Snapchat or Instagram. In explaining the eight messages sent in a row to B.P. in State's Exhibit Two, Collins explained that he was checking in

on Jake who has not been responding to him. Although Collins and his wife were taking a step back from their relationship with B.P., they were not taking a step back from their relationship with Jake and Kelly. So, when Jake was not responding to Collins, he reached out to B.P. Further, Collins explained that the repetitive message in State's Exhibit Six asking B.P. why she was not at school was to inquire if she missed the bus and needed a ride. In the past, Kentessa would give B.P. a ride to school if she missed the bus.

{¶42} The second witness was Collins' mother, Terry. For the weekend of January 30th, she was in Columbus at the Drury Inn with Collins and his family. They did not checkout until noon on February 1st. After checking out, they drove as a group to Cabela's, then ate at McDonald's in the parking lot since the dining area was closed, but that at the next stop, Kroger in Chillicothe, they parted ways as she was tired. She told Collins to get the supplies for the party she was hosting for Collins' two-year-old daughter. Collins and his wife and two children arrived at Terry's house around 6:30 p.m. on February 1st and did not leave until after midnight. On cross-examination, Terry stated that since the allegations, she has not seen much of Collins.

{¶43} Collins' sister Tyra similarly testified that the weekend of January 30th, she was in Columbus for two nights at the Drury Inn with Collins and his family. She also checked out at the same time, around noon, went to Cabela's, McDonald's, and also joined Collins at Kroger. She parted ways when Collins, Kentessa and their children went to Petland to get a fish for his two-year-old daughter. Tyra and her family live with Terry, and she was there when Collins

and his wife and children arrived at 6:30 p.m. on February 1st.  Tyra testified that Collins did not leave Terry's house until midnight.  Tyra also testified of her employment as a substitute teacher at B.P.'s school.  She expanded on one of the interactions she had when she was substituting for one of B.P.'s teachers the week of February 8, 2021.  While in class, she explained that B.P. approached her desk and told her I know you and I know your family.  This was odd to Tyra since she never had any conversation with B.P. prior to that date.

{¶44} The final witness was Kentessa.  She went with Collins, their one-month-old son, and their soon to be two-year-old daughter to Columbus and stayed at the Drury Inn for two nights the weekend of January 30, 2021.  The day they checked out, Collins left her sight only once when he went inside Cabela's and she stayed in the van with their one-month-old son.  She testified that after getting a pet fish for their daughter for her birthday, she and Collins returned home, baked a cake, and then left their house around 6:25 p.m. on February 1st and headed over to Terry's house.  They arrived to Terry's house around 6:30 p.m. and did not leave until midnight.  Collins did not leave and come back when they were at Terry's house.

{¶45} Kentessa continued that she requires Collins' assistance since breaking her ankle in October 2020.  She did not regain full mobility until the end of February 2021.  On the subject of B.P., Kentessa testified that while she was babysitting N.B., she got to know B.P. since she would drop off N.B. and pick him up from their house.  This arrangement, however, ended in October 2020, after Kentessa broke her ankle.  And the interaction with B.P. also became limited, in

which Kentessa testified that B.P. would say some disturbing things, thus, she limited contact with B.P. and even told B.P. she could no longer come over. But prior to limiting her interactions with B.P., Kentessa testified that it was B.P. who installed the Tiktok application on her phone which Kentessa still has on her phone. Kentessa denied Collins has Tiktok or Instagram on his phone, and that she is not aware that Collins messages B.P.

### D. The jury did not lose its way

{¶46} We first note that it appears that Collins is not arguing that the state's witnesses' testimony was internally inconsistent. Rather, he is arguing that the state's evidence is contradictory to his evidence that he was not home alone on the evening of February 1st. One such argument is Collins' challenge to Jake's credibility because Jake estimated the distance between his house and Collins' as being 50 feet, whereas Collins says it is 600 feet. The difference Collins maintains demonstrates that Jake could not see Collins or his van. Collins seems to disregard that due to Jake's illness, he mostly sat at the window that overlooks Collins' house. Jake is very familiar with Collins' appearance as they have been neighbors for four years and interact often with each other. Thus, we cannot conclude that the jury, who was in the best position to gauge the witnesses' demeanor, gesture, and voice inflection, lost its way in finding that Jake saw Collins return home alone before B.P. went over the evening of February 1st.

{¶47} Moreover, Jake's testimony was corroborated by Kelly's testimony who also saw B.P. on February 1st go over to Collins' house and was gone for

approximately 25 minutes.  Collins does not challenge Kelly's credibility.  Again, "a verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses."  *Chancey*, 4th Dist. Washington No. 15CA17, 2015-Ohio-5585, at ¶ 36, citing *Wilson,* 9th Dist. Lorain No. 12CA010263, 2014-Ohio-3182, at ¶ 24, citing *Martinez,* 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, at ¶ 16.

{¶48} Although "a conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed[,]" there was corroborating evidence here.  *State v. Jones*, 2023-Ohio-380, 208 N.E.3d 321, ¶169 (8th Dist.), *appeal not allowed*, 2023-Ohio-2771, 170 Ohio St.3d 1518, 214 N.E.3d 587.  Collins admitted to sending the text message on February 1st to Jake asking for B.P. to bring over the drill.  Collins claimed he was not there and the drill was not at his house, but yet, Collins did not follow-up asking where his drill was until, according to him, he retrieved it on February 10th.

{¶49} We find that the jury did not lose its way in finding that B.P. went that evening over to Collins' house and finding B.P.'s testimony credible.  Additionally, there was no way for B.P. to know that Collins' family was gathering at his mother's house but for B.P. overhearing the facetime phone call, where both Collins and his wife testified that they have cut back on their interaction with B.P.

{¶50} Collins also challenges his conviction because of the 13-day delay in the investigation.  But the delay was explained by Captain Addy as an internal

issue in which B.P.'s investigative report was not transferred to the detective's division from the patrol division until Captain Addy personally retrieved it on February 15th. Captain Addy became aware of the criminal complaint when Kelly called in on February 15th to check on the status of the investigation. The delay was not due to B.P.'s failure to timely report the crime. To the contrary, the very next morning she reported the sexual assault to trusted adults in her life.

{¶51} Collins finally argues that his testimony was straightforward and that he was with his family the whole day on February 1st. We disagree as there were instances of significant inconsistencies during Collins' testimony. Collins testified that he works until 3:30 p.m. and that he is not allowed to have his phone at work. Yet, Collins admitted to sending the two messages in State's Exhibit Six, which are dated Thursday, February 4, with a time of 10:43 a.m., which is during his work hours. The repetitive message was sent to B.P. asking: "Why aren't you in school[?]" Collins explained he sent this message because sometimes when B.P. would miss school his wife would take B.P. to school. However, Collins continued that this was only when Jake and Kelly were still working and that they were no longer working. Jake has not been working since November 2019 due to his cancer diagnosis and medical treatments. Moreover, Kentessa was still homebound with a broken ankle and not permitted to drive at the time Collins sent the message to B.P. Thus, not only was his wife unable to take B.P., but also Kentessa has B.P.'s phone number and could have sent that message to her directly. Collins' messages to B.P. are in contradiction to his claim that he rarely messages B.P.

{¶52} What is more, during cross-examination, Collins provided an alternative reason for sending the messages to B.P. asking why she was not at school. Collins testified that he sent the messages to figure out if B.P. was bringing N.B. over to their house since February 4th was the first day Kentessa was back to babysitting N.B. Again, this explanation was inconsistent with his and Kentessa's testimonies that she was still immobile from breaking her ankle until the end of February. Kentessa stopped babysitting due to her broken ankle. And Collins' explanation was questionable since Kentessa testified that in the past when she was babysitting N.B., B.P. would drop him off around 7:30 a.m. Collins did not message B.P. until 10:41 a.m.

{¶53} The other messages Collins admitted to sending were those in State's Exhibit Two in which he claimed he sent the communication to B.P. because he was worried about Jake. This is yet another demonstration that Collins regularly contacts B.P., and, only the last message of the first set of four messages mentions Jake. Collins does not explain the other seven messages that are directed to B.P. and asking if she got in trouble and why she was not responding to him. There was no mention of Jake in these seven messages.

{¶54} The jury also heard from Kentessa that Collins was not messaging B.P. back and forth, and that if Collins messaged B.P., it would have been solely regarding babysitting N.B., because it would have been Kentessa using Collins' phone to message B.P. Kentessa was not aware of any messaging that was occurring between Collins and B.P. and during cross-examination, she could not explain why Collins would be asking B.P. why she was mad at him. But as

previously outlined, Collins admitted to sending the messages asking why B.P. was ignoring him.

{¶55} The jury was in the best position to observe the witnesses and weigh their credibility, and free to believe all or part or none of the testimony. We find that the jury did not lose its way in resolving conflicts in the evidence and finding Collins guilty of unlawful sexual conduct with a minor. B.P.'s testimony of what happened was descriptive of her interaction with Collins on February 1st. Collins with the cautionary statement that Jake would think something is wrong if B.P. did not enter his house, convinced B.P. to come inside. B.P. was apprehensive because of the earlier messages she received from Collins asking her for oral sex. He continued to push to obtain his sexual desire by first hugging B.P., then, even after his wife called him, returning to the room with his underwear and pants down to his ankles, touching B.P.'s breast area, grabbing her hand and bringing her closer to him and touching her vaginal area, and then pushing her head down on his penis. And when B.P. asked to stop, he said no, and she continued until he ejaculated.

{¶56} Accordingly, there was substantial credible evidence that Collins committed the offense as charged and the jury did not lose its way in resolving the conflict between the state's and Collins' evidence.[2] We hold that the manifest

---

[2] We are mindful that in addressing a manifest weight of the evidence argument, it is our duty to review the entire record and weigh the evidence and all reasonable inferences. We, nonetheless, note that the trial court at sentencing stated the following: "I agree wholeheartedly with the jury. I didn't believe there was any doubt. I didn't believe the defendant. I didn't believe any of his family members that testified. None of it made sense."

weight of the evidence supports Collins' unlawful sexual conduct with a minor conviction and overrule his first assignment of error.

### ASSIGNMENT OF ERROR II

**{¶57}** In the second assignment of error, Collins argues his Fifth Amendment right to remain silent was violated when the state's witness Captain Addy testified that Collins did not want to make a statement during the investigation. Collins acknowledges that the questioning by the state was not objected to, thus, we review the issue under plain error. According to Collins, this one reference was highly prejudicial and created an inference of guilt warranting this court to vacate his conviction.

**{¶58}** In response, the state asserts that Captain Addy's testimony was brief, and was not used by the prosecution as evidence of guilt. The prosecution did not reference Collins' decision not to make a statement in either the opening or closing arguments. Further, during Captain Addy's cross-examination by Collins' counsel, it was established that Collins was cooperative after retaining counsel and met with Captain Addy and made a statement. Finally, Collins testified at trial. Therefore, there was no plain error.

### Law and Analysis

**{¶59}** Collins under this assignment of error acknowledges that he failed to object to Captain Addy's testimony and plain error is the standard of review. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). In order to establish plain error, Collins "must show that (1) there was an error or deviation

from a legal rule, (2) the error was plain and obvious, and (3) the error affected the outcome of the trial." *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, 88 N.E.3d 935, ¶ 26, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). A "substantial right" is a "right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." R.C. 2505.02(A)(1).

{¶60} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This provision applies to the states through the Fourteenth Amendment. *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

{¶61} Collins maintains that his Fifth Amendment right was violated during Captain Addy's questioning by the prosecution in which the following exchange occurred:

Q. Were you contacted by anybody else in Defendant's family?
A. The Defendant himself had contacted me, yes.
Q. Did you retrieve a statement from him?
A. He did not want to give a statement.
Q. Were you contacted by anybody else in the Defendant's family?
A. No.

{¶62} In support of his argument, Collins relies on the Supreme Court of Ohio's decision in *State v. Leach*, 102 Ohio St. 3d 135, 2004-Ohio-2147, 807 N.E.2d 335. In *Leach*, the Supreme Court held that the "[u]se of a defendant's

pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id.* at syllabus. The Court reversed Leach's convictions due to this violation after applying a two-part test: "(1) admitting evidence of pre-arrest silence substantially impairs the policies behind the privilege against self-incrimination; and (2) the government's use of pre-arrest silence in its case-in-chief is not a legitimate government practice." *Id.* at ¶ 28, 38.

{¶63} In *Leach*, the Supreme Court outlined the admitted evidence and the prosecution's reference to the evidence:

> the state's case against Leach contained no physical evidence and rested solely on the credibility of the state's witnesses. At trial, Sergeant Corbett was permitted to testify that Leach had left him the message that he wanted to speak with an attorney before talking to the police. The prosecution alluded to Leach's pre-arrest silence through invocation of his right to counsel during opening argument as well. Leach did not testify at his trial, so evidence of his pre-arrest silence was not used to impeach his testimony. Instead, the state asserts that this evidence is admissible as substantive evidence of guilt.

*Id.* at ¶ 29.

{¶64} In addressing the first part of the test, the Supreme Court held that the policy of the Fifth Amendment was violated in *Leach*:

> Allowing the use of pre-arrest silence, evidenced here by the prearrest invocation of the right to counsel, as substantive evidence of guilt in the state's case-in-chief undermines the very protections the Fifth Amendment was designed to provide. To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering Miranda warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt. See State v. Easter (1996), 130 Wash.2d 228, 240, 922 P.2d 1285. Use of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their

silence or surrender their right not to testify and take the stand to explain their prior silence.

*Leach*, 102 Ohio St. 3d 135, 2004-Ohio-2147, 807 N.E.2d 335, at ¶ 31.

{¶65} In analyzing whether the admission of the statement was a legitimate government practice pursuant to the second part of the test, the Supreme Court held that the testimony of Leach not showing up for his appointment with Sergeant Corbett was legitimate, but not the testimony that Leach wanted an attorney:

> As for the second prong of the Combs analysis, the state argues that this evidence was introduced as evidence of the "course of the investigation." The appellate court found this argument to be unpersuasive, and we agree. *Sergeant Corbett's testimony that he had made an appointment to meet with Leach to discuss the case but that the appointment was not kept is legitimate.* However, we do not find the testimony that Leach stated that he wanted to speak with an attorney before speaking with police to be a statement explaining the course of the investigation. The information was not material to the jury's determination of guilt or innocence. Rather, the state now concedes that it intended to lead the jury to one conclusion by using evidence of Leach's prearrest silence in its case-in-chief: that innocent people speak to police to clear up misunderstandings, while guilty people consult with their attorneys. (Emphasis added)

*Id.* at ¶ 32.

{¶66} The *Leach* case is similar to the case at bar in that the admission of Captain Addy's testimony was for a legitimate government practice. Similar to the facts in *Leach*, Collins was the one who contacted Captain Addy and then indicated he did not want to make a statement. Unlike *Leach*, however, the state did not reference Collins' decision not to give a statement to Captain Addy in opening statement, while cross-examining Collins, or in closing arguments. Thus, the state did not use Collins' decision to not provide a statement to Captain

Addy as substantive evidence of guilt.   Additionally, there is overwhelming evidence establishing Collins' guilt as addressed in the first assignment of error. Moreover, Collins testified and he does not claim that the admission of this isolated statement was a factor in his decision to take the stand.

**{¶67}** Collins' factual situation is similar to the facts in *State v. Gillman*, 5th Dist. Perry No. 20-CA-0018, 2021-Ohio-4377.  The Fifth District overruled a denial of a request for mistrial in which it distinguished *Leach* and held no abuse of discretion:

> Here, Deputy Eveland was asked if he "had the opportunity to interview [Appellant] regarding this." Tr. at 139. Deputy Eveland responded, "No, he declined an interview." *Id.* While Deputy Eveland's response to the prosecutor's question was a reference to Appellant's pre-arrest silence, we find said response was harmless because *Appellant, in contrast to the defendant in Leach, testified in his own defense, thereby, waiving his Fifth Amendment right to remain silent.* Accord, *State v. Poteet*, 7th Dist. Columbiana No. 19-CO-0030, 2020-Ohio-4732; *State v. Wall*, 6th Dist. Erie No. E-19-040, 2020-Ohio-5446. Additionally, unlike *Leach*, in which the prosecution presented testimony regarding the defendant's silence as substantive evidence of guilt, we find the state herein did not affirmatively seek to use Appellant's decision not to be interviewed as such and note Appellant testified he would have talked to the police if he had been contacted. (Emphasis added).

*Id.* at ¶ 35.

**{¶68}** We do not find the admission of Captain Addy's testimony that Collins did not want to give a statement affected the outcome of the case.  We thus, overrule Collins' second assignment of error.

## ASSIGNMENT OF ERROR III

**{¶69}** In the third assignment of error, Collins argues his trial counsel was ineffective for failing to object to the state's direct questioning of Captain Addy in

which the response was that Collins did not want to make a statement.  Collins

maintains that the failure to object was not trial strategy, and because the case

turned to the credibility of witnesses, Captain Addy's testimony was highly

prejudicial.

{¶70} The state disagrees.  First, the state argues that the statement was

brief and was not used by the prosecution as evidence of guilt.  The statement

was not referenced in the prosecutions' opening and closing arguments, thus,

Collins cannot demonstrate prejudice.  Second, it was trial strategy not to object.

During cross-examination of Captain Addy, Collins' counsel established that

Collins was cooperative with Captain Addy and met with the captain after

retaining counsel.

Law and Analysis

{¶71} To demonstrate ineffective assistance of counsel, Collins "must

show (1) deficient performance by counsel, i.e., performance falling below an

objective standard of reasonable representation, and (2) prejudice, i.e., a

reasonable probability that, but for counsel's errors, the proceeding's result would

have been different."  *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952

N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538

N.E.2d 373 (1988), paragraph two of the syllabus.  Failure to demonstrate either

prong of this test "is fatal to the claim."  *State v. Jones,* 4th Dist. Scioto No.

06CA3116, 2008-Ohio-968, ¶ 14, citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052,

80 L.Ed.2d 674.

**{¶72}** Collins "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, citing *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999), citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965). "In order to overcome this presumption, the petitioner must submit sufficient operative facts or evidentiary documents that demonstrate that the petitioner was prejudiced by the ineffective assistance." *Id.*, citing *State v. Davis*, 133 Ohio App.3d 511, 513, 728 N.E.2d 1111 (8th Dist.1999). To demonstrate prejudice, Collins "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

**{¶73}** " '[W]here the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel.' " *State v. Jarrell*, 2017-Ohio-520, 85 N.E.3d 175, ¶ 54 (4th Dist.), quoting *State v. Teitelbaum*, 2016-Ohio-3524, 67 N.E.3d 85, ¶ 113 (10th Dist.), citing *State v. Roy*, 10 Dist. Franklin No. 14AP-223, 2014-Ohio-4587, ¶ 20.

**{¶74}** Collins' counsel did not object during the prosecution's questioning of Captain Addy in which he testified that Collins contacted him but did not want to make a statement. We find no prejudice in counsel's failure to object as the admission did not affect the result of the proceeding. Arguably, it was trial strategy in which Collins' counsel, during the cross-examination of Captain Addy, established that Collins met with the captain and provided a statement in the

presence of counsel.  Such testimony demonstrated Collins' cooperation with the investigation.  Further, Collins testified at trial.

**{¶75}** Wherefore, we overrule Collins' third assignment of error.

CONCLUSION

**{¶76}** Having overruled Collins' three assignments of error, we affirm the trial court's judgment entry of conviction.

**JUDGMENT AFFIRMED.**

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.


For the Court,


BY: _____
Kristy S. Wilkin, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**